# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEJANDRO SANCHEZ,<br><br>Petitioner,<br><br>v.<br><br>M. E. SPEARMAN, Warden,<br><br>Respondent. | Case No. 1:17-cv-00723-JLT-HC<br><br>**ORDER SUMMARILY DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT AND CLOSE CASE**<br><br>**ORDER DECLINING ISSUANCE OF CERTIFICATE OF APPEALABILITY** |

Petitioner filed the instant federal petition for writ of habeas corpus challenging his 2013 conviction.[1] Because it is clear from a review of the petition and the state appellate decision that Petitioner is not entitled to relief, the Court will **SUMMARILY DENY** the petition.

## I. PROCEDURAL BACKGROUND

On April 9, 2013, Petitioner was convicted in the Merced County Superior Court of the attempted murder of his stepfather (Cal. Penal Code §§ 187(a), 664). People v. Sanchez, 2016 WL 280301, at *1 (Cal. Ct. App. 2016), *as modified on denial of reh'g* (Feb. 10, 2016).[2] In addition, the jury found true allegations that Petitioner personally discharged a firearm causing

---

[1] On May 30, 2017, Petitioner consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. No. 7.)

[2] Pursuant to Fed. R. Evid. 201(b), the Court may take judicial notice of court records. United States v. Bernal-Obeso, 989 F.2d 331, 333 (9th Cir. 1993).

1

great bodily injury (Cal. Penal Code 12022.53(d)), that the attempted murder was willful, deliberate, and premeditated (Cal. Penal Code § 189), and that he personally inflicted great bodily injury (Cal. Penal Code § 12022.7(a)). Id. In a bifurcated proceeding, the court found true allegations that Petitioner had suffered a prior serious felony offense within the meaning of California's Three Strikes law (Cal. Penal Code §§ 667(b)-(i), 1170.12). Id. Petitioner was sentenced to a term of life with possibility of parole, doubled, for the attempted murder count, and a consecutive sentence of 25 years to life for personally discharging a firearm causing great bodily injury, plus a consecutive term of one year for the prior prison term enhancement. Id.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District (hereinafter "Fifth DCA"). On January 22, 2016, the Fifth DCA remanded the matter to the trial court to correct a clerical error in the abstract of judgment; in all other respects, judgment was affirmed. Id. Petitioner filed a motion for rehearing, and the motion was denied on February 10, 2016. Id. Petitioner later filed a petition for review in the California Supreme Court, and the petition was denied on December 14, 2016, with citation to In re Dixon, 41 Cal.2d 756, 759 (1953), and In re Lindley, 29 Cal.2d 709, 723 (1947). (Doc. 1 at 2.) On May 15, 2017, Petitioner filed this petition for writ of habeas corpus.

## II. FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision:[3]

> In August 2011, defendant began living in Los Banos with Cynthia Ramos, his mother, and Rito Ramos, his stepfather. Rito [FN2] had been defendant's stepfather since defendant was six years old. Rito let defendant use a 1997 Ford Ranger pickup truck, gave defendant his credit union debit card, and deposited $30 a week into the account for gasoline. After moving into his parents' home, defendant deposited about $1,600 in checks in the credit union account and withdrew the funds. The credit union contacted Rito because there was a problem with the checks defendant had deposited. Defendant assured Rito he had worked for the money and would straighten things out with the person who gave him the checks. Defendant said he would "pay back the bank."
>
> > [FN2] To avoid confusion, we refer to members of the Ramos family by their first names. No disrespect is intended.
>
> Rito made arrangements with the credit union to pay $200 a month. Defendant

---

[3] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

was present. Rito told defendant he was going to have to pay the money. Defendant said he would get a job. Rito arranged to start the payments to the credit union in January 2012. [FN3]

> [FN3] Hereafter, all dates refer to the year 2012.

Rito and Cynthia worked in the San Jose region, commuted with defendant, and usually left for work between 5:30 and 5:45 a.m. Defendant went to a trade school in Milpitas.

Prior to leaving the home the morning of February 1, defendant and Rito got into an argument. The registration on the Ford Ranger pickup truck was coming due, the truck had to pass a smog test, and it also needed a new clutch. The expenses were too much for Rito and he told defendant he was going to sell the truck to a junkyard. Rito asked defendant for the key to the truck. Defendant became angry. Cynthia told her husband and son to stop arguing. Rito and defendant argued about Rito's plans for the truck and about the money owed to the credit union. Defendant said he had no money.

Rito, Cynthia and defendant went outside. Rito told defendant he had to have the money owed "tonight ... so [Rito] could pay the credit union or else." Defendant asked Rito if he was making a threat. Rito replied "Yeah, you better have the money." Rito closed the front door to the house. Rito turned around to face defendant, defendant pulled out a handgun and started firing it at Rito from a distance of eight to 10 feet. Rito was "pinned against the door." Rito heard seven shots. Five of the bullets hit him. Two bullets entered the front door in front of, and behind, Rito. Rito had bullet wounds to his "pinkie," another finger, his right side, and his back. Two bullets grazed Rito's head. [FN4] At one point, defendant moved forward and put the gun to Rito's head. Rito believed defendant "ran out of bullets."

> [FN4] Dr. Fereydoun Azadi, a trauma surgeon, operated on Rito's bullet wounds. Azadi described four bullet wounds: to the back of Rito's head, to the upper back of the chest, to the left side of the chest, and to the left hand of the fifth finger. According to Azadi, Rito would have died if his injuries had been left untreated. Two bullet fragments were left in his body.
>
> Rito was hospitalized for two to three weeks. According to Rito, the doctors "cut [him] open" from his chest cavity to his belly button. He suffered a lot of pain post-surgery.

Defendant ran to the driver's side of the family truck and told Cynthia, "Come on, mom. Let's go." Cynthia removed the keys from the truck. Cynthia saw defendant run toward the south. She called the 911 operator, reported the shooting, and said she thought defendant was in the backyard. Cynthia told an investigating officer that Rito told defendant prior to the shooting that "they could handle the situation today ... [t]hat he could leave today."

Officers from the Los Banos Police Department responded to the 911 call. They found defendant walking on his parents' street. A .22 caliber Ruger was found in the street near the shooting and turned over to the police. The gun appeared to be scratched from the road or from a vehicle running over it. The ammunition magazine was empty, but there was one bullet in the chamber. The firing pin from the gun matched the firing pin indentation from four of the spent shell casings

3

found at the scene of the shooting. The gun's serial number had been deliberately obliterated, something usually done to conceal the fact the weapon had been stolen. Two .22 caliber rounds were found in defendant's bedroom.

Defendant's sister, Jessica Ramos, testified that defendant and Rito had a few talks about defendant's debt, but they did not lead to arguments. A few days before the shooting there was a birthday party for defendant. Defendant was acting distant from the family and isolating himself. Defendant acted this way when he was using drugs. Jessica thought defendant may have used methamphetamine prior to the shooting. Jessica had no experience or training in recognizing when someone was under the influence of drugs, including methamphetamine. Jessica never saw defendant use methamphetamine. Jessica assumed defendant was using methamphetamine because he had been arrested for possessing it in the past. Between January 29 and February 1, defendant did not appear delusional to Jessica. He just stayed away from the family. Jessica let Rito into the house after he had been shot. Rito slumped to the floor with blood coming out of his head. Cynthia told Jessica that defendant shot Rito.

February 1 was a Wednesday. Cynthia told Detective Anthony Parker defendant had used methamphetamine the previous Thursday or Friday. She testified at trial, however, that she told investigators she thought defendant was under the influence of methamphetamine at the time of the shooting.

Parker was one of the investigators assigned to the shooting and had training on how people use methamphetamine. Parker had seen people under the influence of methamphetamine. On February 1, Parker observed defendant for two hours as defendant sat across a table from him after his arrest. Defendant did not appear to Parker to be under the influence of methamphetamine.

Detective Eduardo Solis observed defendant at the police annex after his arrest. Solis had narcotics training and experience with people under the influence of methamphetamine. People using methamphetamine often neglect eating and are paranoid. Defendant was nervous about his circumstances, but his demeanor was otherwise calm. Defendant was cooperative and answered questions. Defendant exhibited no symptoms of being under the influence of methamphetamine.

Officer Danny O'Day assisted with defendant's arrest and continued to observe defendant after he was brought to the detention facility to determine, among other things, whether he was under the influence of narcotics or severely depressed. O'Day had experience with individuals under the influence of methamphetamine and described outward symptoms such as eyelid flutter, dilated pupils, muscle rigidity like a clenched jaw, sweating, and being fidgety. When cooperative, people under the influence of methamphetamine can interact "in a rapid fashion." They can also be "argumentative ... [and] boisterous." O'Day observed defendant continuously in the detention facility for about four hours. O'Day saw no indication defendant was under the influence of methamphetamine.

Cynthia testified defendant cut her face with a box cutter but could not remember the exact date. Defendant was on methamphetamine. She woke him up. She then went to wash clothes. Defendant went into the kitchen and cut her. The wound required stitches and Cynthia sustained a scar from her mouth to her upper cheek bone.

Sanchez, 2016 WL 280301, at *1–3.

**III. REVIEW AND SUMMARY DENIAL OF PETITION**

**A. Preliminary Review of Petition**

Pursuant to Rule 4 of the Rules Governing Section 2254 Cases, "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition and direct the clerk to notify the petitioner." Under § 2243, the court "shall forthwith award the writ [of habeas corpus] or issue an order directing the respondent to show cause why the writ should not be granted, *unless it appears from the application that the applicant or person detained is not entitled thereto*." 28 U.S.C. § 2243 (emphasis added).

In this case, summary dismissal is appropriate because the facts can be determined from the petition and appellate court opinion such that a return from the respondent is unnecessary. The claims clearly lack merit.

**B. Legal Standard of Review**

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards

set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

**C. Review of Claims**

Petitioner raises two claims of insufficiency of the evidence. In his first claim, he alleges

the record of scientific evidence shows no tangible or physical evidence linked Petitioner to the weapon that was recovered. He claims there was no evidence of gunshot residue, DNA, or fingerprints concerning the weapon. In his second claim, he argues that there was a conflict in the evidence concerning the condition and function of the weapon. He notes that the officer who recovered the weapon found the firearm housed an empty magazine, but the expert witness testified that when he viewed the weapon, the frame had been crushed or bent which would have prevented the magazine from being inserted without it getting jammed or stuck. He argues that the state did not account for the chain of custody of the weapon.

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further

explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

Petitioner first presented this claim to the state courts in his petition to the California Supreme Court where it was summarily rejected. Under any standard of review, the claims are meritless.

Petitioner claims that there was a lack of scientific evidence connecting him to the weapon that was recovered. As set forth in the appellate opinion, however, there was in fact substantial evidence connecting him to the weapon recovered. The weapon was discovered near the shooting. It was of .22-caliber which matched the caliber of spent shell casings discovered at the scene. The firing pin from the weapon matched the firing pin indentations from four of the spent shell casings discovered at the scene. Clearly there was substantial evidence that the gun recovered was in fact the gun used in the commission of the crime. Further, two .22-caliber rounds were discovered in Petitioner's bedroom, thus providing evidence connecting him with the weapon.

Petitioner also takes issue with the condition of the gun as examined later by the expert witness. However, when the gun was recovered from the street, it contained an empty magazine and a still-chambered shell, and it showed signs of having been damaged or run over by a vehicle. Thus, the most obvious inference is that the gun had been damaged by a vehicle after Petitioner had discarded it into the street. But regardless of the condition at the time the expert later viewed it, the evidence showed the gun was chambered and the magazine was loaded at the time it was recovered.

Petitioner's complaints therefore amount to requesting that this Court "reweigh the evidence and view it in the light most favorable to the defense," but this is "contrary to the governing standard of review." Jackson, 443 U.S. at 319.

Moreover, Petitioner fails to account for the overwhelming evidence of his guilt. The victim and Petitioner's mother both testified to witnessing Petitioner pull out a handgun and fire seven shots at the victim, five of which struck the victim. They testified that Petitioner then moved forward and placed the gun to the victim's head. The gun did not discharge, and the victim believed Petitioner had expended all of the bullets. They then witnessed Petitioner running to the driver's side of the family vehicle where Petitioner told his mother, "Come on, mom. Let's go." Petitioner's mother removed the keys from the truck, Petitioner ran away, and she called 9-1-1. Petitioner was located by police soon thereafter on the same street. Petitioner's sister also testified that she had opened the door of the house to let the victim in after he had been shot, and she was told by her mother that Petitioner had shot the victim. Thus, under any standard of review, Petitioner's claim that the evidence was insufficient to support the finding of guilt is patently without merit. The petition must be summarily denied.

## CERTIFICATE OF APPEALABILITY

In addition, the Court declines to issue a certificate of appealability. A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-336 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A) the final order in a habeas corpus proceeding in which the detention

complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability when a petitioner makes a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To make a substantial showing, the petitioner must establish that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

In the present case, the Court finds that Petitioner has not made the required substantial showing of the denial of a constitutional right to justify the issuance of a certificate of appealability. Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Thus, the Court DECLINES to issue a certificate of appealability.

**ORDER**

Accordingly, the Court **ORDERS**:

1. The petition for writ of habeas corpus is SUMMARILY DENIED;

2. The Clerk of Court is DIRECTED to enter judgment and close the case; and

3. The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated: **September 7, 2017**         **/s/ Jennifer L. Thurston**
                                     UNITED STATES MAGISTRATE JUDGE